# IN THE SUPREME COURT OF IOWA

No. 20–0824

Submitted October 15, 2020—Filed January 8, 2020

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**RICHARD SCOTT RHINEHART,**

Respondent.

---

On review of the report of the Iowa Supreme Court Grievance Commission.

Grievance commission recommends suspension for violation of ethical rules. **COMPLAINT DISMISSED.**

McDonald, J., delivered the opinion of the court, in which all justices joined. Christensen, C.J., filed a special concurrence in which Waterman, J., joined.

Tara van Brederode and Wendell J. Harms, Des Moines, for complainant.

Richard Scott Rhinehart, Sioux City, pro se.

**McDONALD, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board filed a two-count complaint against attorney Richard Rhinehart arising out of Rhinehart's conduct in two separate litigation matters. Each count of the complaint corresponded to one of the litigation matters. In each count, the Board alleged multiple violations of the rules of professional conduct. A division of the Iowa Supreme Court Grievance Commission found Rhinehart violated the rules in five respects and recommended this court suspend Rhinehart's license to practice law for not less than ninety days. On de novo review, we conclude the Board failed to prove the alleged violations, and we dismiss the complaint.

I.

"We review attorney disciplinary proceedings de novo." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Mathahs*, 918 N.W.2d 487, 489 (Iowa 2018). In the context of attorney disciplinary proceedings, which invokes this court's regulatory authority, de novo review means we review the violations and sanctions anew without regard to whether the parties have preserved or raised the issues. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Tindal*, 949 N.W.2d 637, 643 (Iowa 2020) ("In our view, we may undertake de novo review of the commission's record, including any rule violations alleged by the Board, even if the commission found the Board failed to prove the violation. Indeed, we have the power to review the commission record de novo and impose sanctions when no party appeals or applies for permission to appeal."). "We may impose a greater or lesser sanction than what the commission has recommended upon proof of an ethical violation." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noyes*, 936 N.W.2d 440, 442 (Iowa 2019) (quoting *Mathahs*, 918 N.W.2d at 489).

II.

A.

Count one of the Board's complaint arose out of a family law matter. In that case, Rhinehart represented the mother in an action to modify a decree of dissolution of marriage entered in Nebraska. The decree awarded the mother physical care of the parties' child, N.V. Rhinehart filed the petition for modification in Iowa in October 2012. In the petition for modification, the mother alleged N.V. had been sexually abused by one of the child's cousins, B.B., while in the father's care during visitation. The record shows the cousin licked N.V.'s penis, taught N.V. how to pull up his pants, and told N.V. not to tell anyone about the incident. At the time of the abuse, B.B. was five years old and N.V. was three years old. In the petition, the mother prayed the father's visitation with N.V. be supervised until the court could determine N.V. was no longer in danger while in the father's care.

On November 28, 2012, Rhinehart filed an application on behalf of the mother for an emergency hearing on temporary custody and physical care. The application alleged the father failed to supervise and protect N.V. during visitation. The application was supported by an affidavit from the mother. The affidavit stated N.V. told the mother B.B. was sexually abusing him. B.B.'s mother admitted the child had been doing inappropriate things with two other children as well. The affidavit stated the mother was taking N.V. to psychiatrist Dr. Daniel Gillette. Dr. Gillette stated N.V. had posttraumatic stress disorder (PTSD) and the plan of treatment included therapy and removal of N.V. from the abusive situation.

The application for temporary matters came on for hearing in March 2013. Amanda Korinke, a therapist at the Mercy Child Advocacy Center,

testified for the mother. She testified she also began treating N.V. after the allegations of sexual abuse. She testified the child was suffering from PTSD and was afraid to go to the father's residence for visitation. The mother put into evidence the affidavit of Dr. Gillette. Dr. Gillette's affidavit concluded, "I would consider it appropriate to stop contact with the father and would tend to support such a decision by the courts." The mother testified at the hearing. She testified N.V. told her B.B. "licked his penis" and told N.V. not to tell. B.B.'s mother also testified. She testified she learned the children were licking each other. When she learned of it, she took B.B. to treat with Dr. Angela Stokes. B.B.'s mother testified the department of human services was notified of the situation, investigated the situation, and did not confirm a finding of sexual abuse. The father put into evidence the affidavit of Dr. Stokes. Dr. Stokes opined there was no evidence B.B. was a perpetrator. Dr. Stokes's affidavit stated the children's sexual behaviors were age appropriate sex play, according to the research. In her opinion, B.B. had not engaged in deviancy.

The district court denied the application regarding temporary custody and physical care. The court found restriction of contact between N.V. and the father was "not the correct course of action. Rather, the parties should look to addressing N.V.'s current behaviors through an expansion of N.V.'s counseling that would include both parents." While the court denied the application for supervised visitation, the court ordered the father "should not allow N.V. any unsupervised contact with the offending cousins."

Rhinehart took the deposition of Dr. Gillette on July 11, four months after the hearing on temporary matters. Leading up to the deposition, Dr. Gillette issued a report based on evaluations of N.V. that occurred after the hearing on temporary matters. Dr. Gillette opined,

It is my opinion beyond a reasonable doubt that *ongoing sexual abuse* has been occurring against [N.V.] perpetrated by an older cousin . . . and that the father has been aware of this abuse, and has taken no meaningful steps to prevent the ongoing abuse . . . .

(Emphasis added.) Dr. Gillette further stated N.V. "developed clear and compelling symptoms of [PTSD] which are a direct result of the sexual abuse that he has endured in the past *and continues to endure* while in his father's care." (Emphasis added.) Dr. Gillette recommended that "all contact with the father be cut off by order of the court."

After taking Dr. Gillette's deposition, Rhinehart filed a renewed application for emergency hearing on temporary custody and physical care. The father resisted and argued this issue had already been before the court. The father also requested sanctions. The district court agreed with the father and denied the renewed application. The district court concluded the allegations in the petition were not new and did not constitute an emergency. The district court found,

[T]he actions of counsel [Rhinehart] in this matter particularly disturbing. Counsel was aware that this information was not new. Under the current paperless system that the court is utilization [sic] for its operation by designating the matter as an "emergency" and placing it in red letters in the filing queue, counsel was aware that it would be placed in front of other pending matters of equal or higher importance and chose to mislead the court by so doing.

The court granted the father attorney fees in the amount of $2000 and sanctioned Rhinehart $2000 for intentionally abusing the court's emergency process.

The matter came on for trial in March 2014. At that time, the district court observed that the original decree was issued in Nebraska. The district court sua sponte concluded it lacked jurisdiction pursuant to the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), Iowa Code chapter 598B, and it dismissed the modification action.

The court of appeals affirmed the dismissal. *See LaCroix v. Verdoorn*, No. 14–0619, 2016 WL 4384429, at *4–5 (Iowa Ct. App. Aug. 17, 2016). The court of appeals also affirmed the sanctions. *Id.* at *6. The court of appeals concluded there was substantial evidence supporting the district court's finding "there was not an 'emergency' as a matter of fact." *Id.*

## B.

The alleged rule violations in this case arise out of the renewed application for emergency hearing on temporary custody and physical care. It is the Board's burden to prove "ethical violations by a convincing preponderance of the evidence." *Noyes*, 936 N.W.2d at 442 (quoting *Mathahs*, 918 N.W.2d at 489). "A convincing preponderance of the evidence lies between the preponderance-of-the-evidence standard in a civil case and the reasonable-doubt standard in a criminal case." *Id.* at 442. We address each alleged violation in turn.

### 1.

The commission found Rhinehart violated Iowa Rule of Professional Conduct 32:3.1 in filing the renewed application. The rule provides:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law.

The commission found Rhinehart violated this rule because the information presented at the second emergency hearing was the same information presented at the first emergency hearing.

The commission's finding is not supported by the record. At the hearing in August 2013, the mother testified there had been instances since March where B.B. initiated or attempted to initiate sexual contact

with N.V.  According to the mother, there was an instance in July where B.B. tried to convince N.V. to touch tongues.  The father admitted he was "aware of the oral sex that's taken place between [N.V.] and [his] nephew [B.B.]."  The father admitted he was aware of a recent allegation that B.B. tried to talk N.V. into "touching tongues and kissing tongues."  Dr. Gillette's report prepared in July 2013—four months after the first hearing—concluded there was "ongoing sexual abuse," i.e., continued abuse after the March 2013 order.

Given the new allegations and new evidence, we cannot conclude the renewed application was frivolous within the meaning of the rule.  The renewed application was supported by Dr. Gillette's opinion and the mother's testimony regarding what she perceived to be ongoing risk of sexual abuse.  There was contrary testimony at the hearing.  Dr. Stokes testified that the acts, even if true, did not constitute abuse.  In Dr. Stokes's view, the sexual conduct constituted normal sex play that should be addressed appropriately.  The district court credited Dr. Stokes's testimony.  However, the fact that Rhinehart did not obtain relief for his client does not make the application frivolous:

> The filing of an action, defense, or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery.  What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions.  Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail.  The action is frivolous, however, if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification, or reversal of existing law.

Iowa R. Prof'l Conduct 32:3.1 cmt. [2]. "[A]n attorney is not subject to sanctions for merely making factual assertions or legal arguments that ultimately are unsuccessful." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Caghan*, 927 N.W.2d 591, 601 (Iowa 2019).

On de novo review, we conclude the Board failed to prove the violation by a convincing preponderance of the evidence. Here, there was a good faith basis for filing a renewed application based on the opinion of a treating medical provider and allegations of sexual abuse occurring after the entry of the prior order.

2.

The commission also found Rhinehart violated rule 32:3.3(a)(1). Rule 32:3.3(a)(1) provides: "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." A lawyer's false statement to the court can be either oral or in writing. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 462 (Iowa 2014). "[T]he word 'knowingly' in the context of this rule requires actual knowledge, and we may infer an attorney's knowledge from the circumstances." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 150 (Iowa 2018) (alteration in original) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 475 (Iowa 2014)). "We will not infer an attorney made a misrepresentation knowingly simply because the misrepresentation occurred." *Barnhill*, 847 N.W.2d at 486.

The commission found the renewed application included false statements that the father was ignoring the district court's prior order, that the father was refusing to protect the child, that the father was leaving the child unattended with the abuser, that the child was suffering from PTSD, and that the father was failing to provide adequate supervision to

the child. The commission found Rhinehart violated the rule because the testimony at the hearing failed to "substantiate the claims he made in the application."

We conclude the Board failed to prove the violation by a convincing preponderance of the evidence. The statements at issue here were not false statements of fact. They were allegations Rhinehart believed could be proved at a hearing on the matter. As discussed above, the allegations in the renewed application were made in good faith and supported by new evidence. Whether the evidence substantiated the claims in the renewed application is immaterial with respect to this alleged rule violation. It would be a stretch to say a lawyer can be disciplined for good faith averments in a petition or application that are not borne out by the evidence. *See Caghan*, 927 N.W.2d at 601 (stating an attorney cannot be disciplined merely because an argument was unsuccessful). While the district court may not have found Rhinehart's evidence credible or convincing, this does not make the good faith allegations in the renewed application false statements of fact in violation of rule 32:3.3(a)(1).

The mere fact the district court sanctioned Rhinehart for filing the renewed application does not support the conclusion Rhinehart violated the rules of professional conduct as alleged in the Board's complaint. Not all conduct supporting a litigation sanction violates the rules of professional conduct, and not all conduct violating the rules of professional conduct results in a litigation sanction. Sanctionable conduct and professional misconduct may overlap but are not congruent. Here, the district court sanctioned Rhinehart for designating the renewed application an emergency application because, in the district court's view, the renewed application was based on the same "information"—alleged sexual abuse of N.V. by B.B. and the father's failure to prevent it—and did

not warrant emergency relief. The court of appeals affirmed, concluding there was substantial evidence supporting the finding there was no "emergency." *LaCroix*, 2016 WL 4384429, at *6. Neither court concluded the renewed application contained false statements. Although the courts disagreed with Rhinehart over whether there was an emergency, that was an assessment of the new evidence and not a finding or conclusion Rhinehart made a false statement of material fact.

Moreover, neither the Board nor commission relied on issue preclusion, nor does that doctrine apply under these circumstances. Iowa Court Rule 36.17(4)(*b*) allows the Board to invoke issue preclusion when certain conditions are met, including that the "burden of proof in the prior proceeding was greater than a preponderance of the evidence." *See also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 177–78 (Iowa 2013) (discussing requirements for issue preclusion in disciplinary cases). That condition is not met here. Litigation sanctions may be awarded under Iowa Rule of Civil Procedure 1.413 when the violation of that rule is established by a preponderance of the evidence. By contrast, the Board must prove a violation of a disciplinary rule by a convincing preponderance of the evidence. And our review of the disciplinary violation is de novo, while the court of appeals affirmed Rhinehart's litigation sanction under a deferential standard of review for abuse of discretion. *See LaCroix*, 2016 WL 4384429, at *5; *see generally First Am. Bank v. Fobian Farms, Inc.*, 906 N.W.2d 736, 744 (Iowa 2018) ("We review a district court's order imposing sanctions under our rules of civil procedure for an abuse of discretion." (quoting *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012))).

3.

The commission found Rhinehart violated rule 32:8.4(d) in filing the renewed application. Rule 32:8.4(d) provides "[i]t is professional misconduct for a lawyer to: (d) engage in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 32:8.4(d). The commission found the Board proved the violation because the renewed application was based on "false facts" and because no new evidence was presented in support of the renewed application.

We conclude the Board failed to prove the violation by a convincing preponderance of the evidence. This rule is intended to prohibit conduct "that has an undesirable effect—some interference with the operation of the court system." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weiland*, 885 N.W.2d 198, 212 (Iowa 2016) (emphasis omitted). "We have said that 'there is no typical form of conduct' that violates the rule." *Caghan*, 927 N.W.2d at 606 (quoting *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Steffes*, 588 N.W.2d 121, 123 (Iowa 1999) (en banc)). The conduct "must hamper 'the efficient and proper operation of the courts or of ancillary systems upon which the courts rely' by violating the well-understood norms and conventions of the practice of law." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Silich*, 872 N.W.2d 181, 191 (Iowa 2015) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011)).

There is no evidence here of conduct violating the well-understood norms and conventions of the practice of law that interfered with the operation of the court system. As discussed above, the allegations in the renewed application were asserted in good faith and not false. As also discussed above, there was new evidence presented in support of the renewed application. Dr. Gillette opined there was ongoing abuse, i.e., abuse after the March 2013 hearing. There was also evidence, including

an admission from the father, that after the initial hearing there was an incident of alleged abuse where B.B. asked N.V. to kiss or touch tongues. B.B.'s mother acknowledged B.B.'s conduct was inappropriate. We cannot conclude a renewed application for temporary relief brought in good faith and supported by evidence from the treating medical provider can be considered conduct prejudicial to the administration of justice.

"We have never found an attorney's conduct to be prejudicial to the administration of justice without an underlying violation of some other disciplinary rule." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 50 (Iowa 2014). On de novo review, we conclude the Board failed to prove this violation.

C.

Rhinehart engaged in zealous advocacy on behalf of his client. It was his duty to do so. *See* Iowa R. Prof'l Conduct 32:1.3 cmt. [1] ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf."). He filed an application for an emergency hearing based on credible—in fact undisputed—allegations the child's cousin licked the child's penis while in the father's care. After failing to obtain relief for his client, Rhinehart filed a renewed application for an emergency hearing based on the opinion of a treating medical provider and other evidence N.V. had continuing unsupervised contact with B.B. In one instance of unsupervised contact, B.B. asked N.V. to touch tongues. While Dr. Stokes did not find the allegations concerning and while the district court did not find the evidence compelling, Rhinehart's decision to file a renewed application did not cross the line between zealous advocacy and unethical conduct. We conclude the Board failed to prove by a convincing preponderance of the evidence the violations in count one of the complaint.

III.

A.

Count two of the Board's complaint arose out of a business litigation matter between two former business partners.

On October 11, 2016, the law firm of Rawlings, Ellwanger, Jacobs, Mohrhauser & Nelson, L.L.P., sent a letter to C & K Comfort Systems and Ben Koeppe informing Koeppe that the law firm had been retained by Ian Cardona, a partner in C & K Comfort Systems, and that Cardona sought to withdraw from and dissolve the partnership.

Koeppe retained Rhinehart to represent him in the business dissolution matter. In January 2017, Rhinehart filed a petition for declaratory judgment. The petition contained two counts: (1) declaratory judgment; and (2) breach of contract. In the petition, Koeppe alleged Cardona had been siphoning off partnership assets to fund a competing venture. Koeppe declared he was entitled to the assets that would have been distributable on October 11, 2016, had Cardona not diverted them.

The litigation was contentious and involved extensive motion practice. In particular, the parties had numerous disputes related to Cardona's production of documents in response to discovery requests. Rhinehart requested the appointment of a special master. The district court denied the request; however, the district court did order that certain discovery be completed. As relevant here, in May 2017, the district court ordered Cardona to provide

> copies of all bank statements and check registers of any other accounts used by the defendant in either continuing the business of the partnership or any other business undertaken by the defendant from and after October 11, 2016, to the current date. The same records shall be provided for the defendant's personal bank accounts including those of his spouse for the same period.

Despite the district court's order requiring the production of business and personal bank statements and check registers, the parties had ongoing discovery disputes regarding Cardona's failure to produce the records. Rhinehart filed a motion to compel the production of documents. The district court ordered Cardona to produce the records for his new company, Excel Comfort (Excel). As of July 2017, Cardona had still not produced the documents. Rhinehart filed a renewed motion for special master and renewed his request for the production of documents. In August, the district court ordered Cardona to respond to all outstanding discovery.

Despite the district court's newest order regarding discovery, the parties still had ongoing discovery disputes regarding Cardona's failure to produce records. In September 2017, Rhinehart filed a renewed motion to compel. He requested the business records for Excel. On October 19, Cardona's attorney, Ellwanger, sent Rhinehart an email stating he would produce the monthly statements from Excel from October 27, 2016, until March 1, 2017. Rhinehart agreed to this. Based on this understanding, the attorneys contacted the district court and represented the discovery dispute had been resolved. On October 20, the district court entered an order denying relief because the parties had represented they had resolved the discovery dispute.

In December, Rhinehart followed up with Ellwanger because Ellwanger still had not produced the promised documents. In response, Ellwanger said, "I thought we had completed the discovery," and "I am not even sure what this Exel [sic] stuff is." Ellwanger's statement that he was "not even sure what this Exel [sic] stuff is" is hard to reconcile with a prior email contained in the same email chain in which Ellwanger agreed to

produce "the monthly statements of Excel from the date the account was opened, 10/27/16, until March 1, 2017."

The record shows Ellwanger had still not produced the requested documents as of March 2018. At that time, the court issued an order that defendant shall respond to all outstanding discovery. After this order, Ellwanger filed a formal objection to the production of the Excel business records. This is despite his prior representation to the court that the parties had resolved their discovery dispute based on his agreement to produce "the monthly statements of Excel from the date the account was opened, 10/27/16, until March 1, 2017."

The matter came on for a bench trial in June and July of 2018. Ellwanger had still not produced the business records by the time of trial, but Rhinehart was under the mistaken assumption that certain bank records that had been produced contained the Excel bank records. This misunderstanding was revealed during trial when Rhinehart discovered he had one set of the defendant's bank records but did not have the Excel bank records.

On the merits of the case, the district court granted Rhinehart's client, Koeppe, some limited relief. For the most part, however, Koeppe was unsuccessful on his claims. The district court concluded Koeppe failed to prove he was entitled to any excess distributions and failed to prove Cardona misappropriated company property or inequitably divided the profits from partnership work. According to Rhinehart, Koeppe was prejudiced by Cardona's failure to produce the Excel bank statements because he could not prove much of his case without the records.

Rhinehart filed a motion to amend and enlarge the district court's trial ruling and judgment. A large part of the motion to amend and enlarge was dedicated to Cardona's failure to produce the business records. In

the motion, Rhinehart wrote, "This court criticizes Plaintiff for failure to provide adequate proof and information while at the same time rewards the Defendant for ignoring the Court Order and hiding the information." He further wrote, "The Court's judgment in this case rewards the Defendant's devious actions and willful violation of Court orders." In a reply brief to Cardona's response to the motion to amend, Rhinehart accused attorney Ellwanger of "double talk" regarding discovery and said the court "condoned" the double talk. The district court denied the motion.

## B.

The alleged rule violations in count two of the Board's complaint arise out of Rhinehart's motion to amend and enlarge.

## 1.

The Board alleged Rhinehart violated rule 32:3.1 for filing a motion to amend and enlarge. Recall, rule 32:3.1 provides a lawyer shall not controvert an issue "unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." Iowa R. Prof'l Conduct 32:3.1.

The commission found the Board failed to prove this violation by a convincing preponderance of the evidence. As the commission explained, "It is common for attorneys to file a motion to enlarge or amend following an unfavorable ruling. [The case] was a convoluted matter with several issues to address." The commission ultimately concluded, "The mere fact that Rhinehart filed the motion to enlarge and amend in and of itself does not rise to the level of an ethical violation."

On de novo review, we agree with the commission's resolution of the alleged violation.

2.

The Board next alleged Rhinehart violated rule 32:3.3(a)(1) when he included false statements in his motion to amend and enlarge the district court's ruling. Specifically, Rhinehart asserted (1) Cardona placed a significant portion of partnership funds into the Excel bank account; (2) Cardona intentionally and willfully violated a court order in failing to produce the business records; and (3) Cardona testified he placed partnership funds in the Excel bank account.

The commission concluded the Board failed to prove the violation with respect to the first two statements. The commission explained the matter "was a complicated one due to the parties['] failure to keep clear records, the formation of a new business during the pendency of the lawsuit in addition to the, on occasion, unclear documentation by the attorneys involved." The commission concluded the first two statements could not be false because of the subjective nature of the claims. On de novo review, we agree with the commission's resolution of these violations.

The commission did find Rhinehart knowingly made a false statement in his motion papers when he wrote Cardona testified he placed partnership funds in the Excel bank account. We agree with the commission that this was an incorrect statement regarding Cardona's testimony as Cardona explicitly testified to the opposite.

Although we agree with the commission that Rhinehart's statement was incorrect, we cannot conclude the Board proved this violation by a convincing preponderance of the evidence. Rule 32:3.3(a)(1) provides: "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." "We will not infer an attorney made a misrepresentation knowingly simply because the

misrepresentation occurred." *Barnhill*, 847 N.W.2d at 486. "[M]isrepresentation requires intent to deceive to support an ethical violation." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Sobel*, 779 N.W.2d 782, 787 (Iowa 2010).

The circumstances here do not support an inference Rhinehart had the intent to deceive. Rhinehart made a statement regarding his recollection of the testimony in the case. His recollection was wrong. His recollection was more likely than not colored by his apparently sincere belief that Cardona did in fact divert partnership money into the Excel bank account, an allegation Rhinehart found he was unable to prove without access to the Excel bank records. We think it is unlikely that Rhinehart made the statement with the intent to deceive the district court knowing the district court heard Cardona's testimony. We are reluctant to sanction an attorney's statements made in a posttrial motion regarding the evidence at trial when, frequently, the motions are made without a full and complete transcript and the evidence and ultimate fact issues are disputed. Of course, this is not to say such statements can never violate rule 32:3.3(a)(1). We simply conclude the Board failed to show by a convincing preponderance of the evidence that Rhinehart knew this statement was false when made and that Rhinehart made this statement with the intent to deceive the district court.

### 3.

Finally, the Board alleged Rhinehart violated rule 32:8.2(a). The rule provides, "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer, or public legal officer . . . ." Iowa R. Prof'l Conduct 32:8.2(a). This rule includes statements made about judges in court filings. *See Iowa Sup. Ct. Bd. of*

*Pro. Ethics & Conduct v. Ronwin,* 557 N.W.2d 515, 522–23 (Iowa 1996) (per curiam) (finding a violation for statements regarding the integrity of judges made in pleadings and briefs).

To prove a violation of the rule, the Board must prove by a convincing preponderance of the evidence the statement at issue was sufficiently factual to be "capable of being proved true or false." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Weaver,* 750 N.W.2d 71, 82 (Iowa 2008). The Board must also prove the lawyer subjectively knew the statement was false when made or the lawyer made the statement with reckless disregard for its truth or falsity. *See* Iowa R. Prof'l Conduct 32:8.2(a). The Board must also prove the statement concerned "the qualifications or integrity of a judge, adjudicatory officer, or public legal officer." *Id.* And finally, "one of the purposes of the rule is to 'maintain the fair and independent administration of justice.'" *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Att'y Doe No. 792,* 878 N.W.2d 189, 198 (Iowa 2016) (quoting Iowa R. Prof'l Conduct 32:8.2(a) cmt. [3]). Thus, the statement must be made in a context whereby the statement actually hindered or caused to be questioned the fair and independent administration of justice. *See id.*

The commission found the following statements in Rhinehart's motion to amend and enlarge violated the rule: (1) the district court rewarded Cardona for willfully ignoring discovery orders; (2) the district court condoned Ellwanger's double talk on discovery issues; and (3) relatedly, the district court faulted Rhinehart for believing Ellwanger's misrepresentations regarding discovery. In concluding the Board proved the violations, the commission parsed through the statements to conclude they were false. For example, the commission concluded it was false to say the district court "rewarded" Cardona because the district court's

ruling was reasonable but not a "reward" to Cardona. The commission parsed the other statements similarly.

On de novo review, we conclude the Board failed to prove the violations by a convincing preponderance of the evidence. Fairly read, Rhinehart's statements do not express a false statement "concerning the qualifications or integrity of a judge." Iowa R. Prof'l Conduct 32:8.2(a). There is no mention of the district court's qualifications or integrity. Instead, Rhinehart criticized the district court's decisions regarding discovery and the district court's ruling on the merits. Rhinehart argued the judgment rewarded Cardona's discovery conduct because Koeppe was unable to prove his case against Cardona without the business record.

The statements at issue in this case are simply different in kind from the statements we have found to violate rule 32:8.2(a). For example, in *Iowa Supreme Court Attorney Disciplinary Board v. Kennedy*, the lawyer wrote a letter to the Iowa Attorney General accusing the Polk County Attorney's Office of engaging in a conspiracy to coerce an incarcerated witness to testify against the lawyer's client in a high-profile homicide case. *See* 837 N.W.2d 659, 663 (Iowa 2013). The lawyer alleged the Polk County Attorney's Office was forcing the potential witness to take drugs and was "mentally, emotionally, and physically abus[ing]" the potential witness in retaliation for the witness's refusal to testify. *Id.* The allegations were false, and we concluded the attorney violated the rule because she had no " 'objectively reasonable basis' for her false attacks on the integrity of public officers." *Id.* at 671 (quoting *Weaver*, 750 N.W.2d at 90). In addition, the lawyer's letter impeded the administration of justice because it "spurred a lengthy and costly investigation into the allegations of misconduct and coercion." *Att'y Doe No. 792*, 878 N.W.2d at 199 (discussing *Kennedy*, 837 N.W.2d at 663–64).

In *Iowa Supreme Court Attorney Disciplinary Board v. Weaver*, the district court sentenced a former district associate judge to a two-year term of incarceration following his conviction for operating while intoxicated, second offense. *See* 750 N.W.2d at 75–78. Weaver spoke to a newspaper reporter about the case. *See id.* at 77–78. In a published newspaper article, Weaver accused the sentencing judge of personal bias and dishonesty. *Id.* Among other things, Weaver stated, "I can't speculate about the reasons why he did this, . . . [b]ut he's not being honest about the reasons why he committed me to the Department of Corrections." *Id.* at 86 (alteration in original). The publication of Weaver's statements cast unfounded aspersion upon the sentencing judge.

In *Iowa Supreme Court Board of Professional Ethics and Conduct v. Ronwin*, an attorney made false statements about state court judges and other attorneys in pleadings submitted in federal court. 557 N.W.2d at 521–23. Ronwin accused a state judge of "deliberately lying" to help others steal from him. *Id.* at 521–22. He also alleged that the judge entered a directed verdict against Ronwin even though the judge knew the grounds were false, that the judge conspired with others to harm Ronwin, and that the judge's "conduct amounts to criminal obstruction of justice." *Id.* at 521. He also maintained the state court judge's acts "were not the result of incompetence but of deliberate criminal abuse of power." *Id.* at 522. Ronwin's accusation of criminality and abuse of power cast untrue aspersions on the administration of justice.

In our view, Rhinehart's word choices—"rewards" and "condoned"— unduly personalized the role of the district court in adjudicating a hard-fought case. However, these less-than-ideal word choices did not cross the boundary into conduct that violated rule 32:8.2(a). Rhinehart's statements did not "hinder[] the fair and independent administration of

justice. Because this situation is considerably different than the prior cases in which we have found a violation, we find that the Board failed to prove a violation of rule 32:8.2(a)." *Att'y Doe No. 792,* 878 N.W.2d at 199.

## IV.

The Board failed to prove by a convincing preponderance of the evidence that Rhinehart violated the rules of professional conduct as alleged in its complaint. We dismiss the complaint with prejudice. *See Ouderkirk,* 845 N.W.2d at 50–51 (dismissing complaint with prejudice where Board failed to prove violations by a convincing preponderance of the evidence); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rasmussen,* 823 N.W.2d 404, 411 (Iowa 2012) ("Rasmussen did not violate any disciplinary rule. The case is dismissed."); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Olson,* 807 N.W.2d 268, 282–83 (Iowa 2011) (dismissing complaint).

**COMPLAINT DISMISSED.**

All justices concur. Christensen, C.J., files a special concurrence, which Waterman, J., joins.

#20–0824, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*

**CHRISTENSEN, Chief Justice (concurring specially).**

I join the majority decision but write separately to emphasize that our dismissal of the disciplinary complaint against Rhinehart should not be interpreted as condoning his behavior. In addition to demanding that attorneys maintain ethical behavior as outlined in our rules of professional conduct, we also expect attorneys to behave with civility and professionalism. "Ethical violations are enforced through the traditional disciplinary process, while all but the most extreme violations of the obligation of civility are enforced by courts [through sanctions]." Donald E. Campbell, *Raise Your Right Hand and Swear to be Civil: Defining Civility as an Obligation of Professional Responsibility*, 47 Gonz. L. Rev. 99, 144 (2011–2012) [hereinafter Campbell]. "To put it another way, ethical obligations can be seen as the shall-nots of lawyering, and professionalism as creating affirmative obligations of the lawyer to the broader society." *Id.* at 139. "[P]rofessionalism is defined not as what a lawyer must do (obey ethics rules while acting zealously on behalf of a client), but by what a lawyer *should* do to protect the integrity of the legal system." *Id.* at 141. When attorneys engage in uncivil and unprofessional behavior, they lower the bar for our profession and open the door for ethics complaints against them.

As this court noted, Rhinehart "unduly personalized the role of the district court in adjudicating a hard-fought case." Rhinehart justifies his behavior by characterizing himself as a zealous advocate. While his word choice in criticizing the district court in his motion to amend and enlarge may have made his client feel better, it did nothing to help his client legally. As the district court judge who presided over the case testified to the grievance commission, Rhinehart's language that the district court was

"reward[ing] the Defendant for ignoring the Court Order" "doesn't tell [the district court it] did anything wrong as a matter of fact or law. There's nothing identified there that [the district court] needed to correct or change." Attorneys should not justify hostility as zealous advocacy because they can zealously advocate for their clients' interests while still treating others with fundamental decency and respect.

While the rules violations Rhinehart was charged with deal with his behavior towards the tribunal, his abrasive treatment of opposing counsel in the Koeppe matter was also unnecessary. For example, when he was frustrated about not receiving certain documents in discovery from opposing counsel, he emailed opposing counsel:

> So my plan is to subpoena your client to my office sometime during the week between Christmas and New Year and force him to produce the records and respond to my questions in a deposition. You are great on promises and lousy on delivery. What day works for you between December 26th and December 30th. If I don't he[a]r from you by noon tomorrow I will just a pick a time that works for me.

In response to a different letter from Rhinehart about setting a trial date, opposing counsel emailed Rhinehart, "Why does every letter you write have to be nasty. I also want to get it done that week. I am trying to figure something out[.]" Rhinehart replied, "You promise quick response. All lies. I am bored with your lack of professionalism. Time to retire[.]"

Rhinehart accused this opposing counsel of lying multiple times during the course of the Koeppe case and repeated these assertions without support during these disciplinary proceedings. Rhinehart told the commission that this opposing counsel "either . . . doesn't care about the rules or he is so suffering mentally with dementia or poor memory that he does these things." He also declared, "And my suggestion is that [opposing counsel] has some kind of mental illness, some kind of inability to recall

events." Opposing counsel also testified before the commission, and nothing in the record supports Rhinehart's claims about opposing counsel's mental status. It goes without saying that making flippant, unsubstantiated comments about anyone's mental status is incredibly offensive. The district court judge testified before the commission that it was Rhinehart's "language when [he] referenced [opposing counsel was] a liar and should retire" that led the judge to make a referral to the disciplinary board about Rhinehart's behavior.

Ultimately, Rhinehart's behavior in the Koeppe case has forced our court into the unenviable position "to act as 'kindergarten cop' and [review] a dispute between attorneys caused by one who either never learned or has forgotten the basic good manners others learned before first grade." *Saldana v. Kmart Corp.*, 84 F. Supp. 2d 629, 640 (D.V.I. 1999), *aff'd in part, rev'd in part*, 260 F.3d 228 (3d Cir. 2001). This is not the first time Rhinehart's caustic behavior has come to the attention of our court. In 2013, we suspended Rhinehart's license for sixty days for extrinsic fraud by failing to disclose two pending contingency-fee cases during his marriage dissolution proceeding and for disbursing disputed client fees to himself. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 183 (Iowa 2013). The district court presiding over Rhinehart's dissolution noted Rhinehart "has demonstrated a lack of credibility, and also a willingness to say whatever he thinks will benefit him throughout the course of the present proceedings." *Id.* at 173. In recommending a sixty-day suspension of Rhinehart's license, the grievance commission explained, "[Rhinehart] continued to exhibit little or no remorse in either count of the Complaint. He continued to attempt to relitigate the extrinsic fraud issue, and even in stipulating to Count II, attempted to justify his actions." *Id.* at 182. Unfortunately, though Rhinehart did not violate our

professional rules in this case, not much has changed about his behavior since 2013.

During these disciplinary proceedings, Rhinehart focused on relitigating the family law matter that led to count one of the Board's complaint. The district court in that case concluded it lacked jurisdiction and sanctioned Rhinehart for abusing the court's emergency process. In his commission hearing, Rhinehart questioned several witnesses in an attempt to relitigate both of these issues. He also deposed the court of appeals judge who wrote a concurrence affirming the district court's decision in which the concurrence wrote the district court had authority to award sanctions due to the dismissal of the case on jurisdictional grounds. Rhinehart spent most of this deposition trying to relitigate the matter by posing legal "hypotheticals" based on the same fact pattern as his case and stressing his belief that this judge was wrong.

Rhinehart never appealed the court of appeals ruling, but he admitted during the deposition that he sent this judge a letter "explaining what [he] thought was the flaw in [her] decree." Rhinehart later told the grievance commission, "I want you to read [that judge's] deposition. She had no idea what she was talking about. She had no idea what she was doing with that case. She couldn't even verify she read the briefs. It's just incredible." Notably, Rhinehart never asked the judge during her deposition if she read the briefs, so she never had the opportunity to verify whether she read them. He asked her if she reviewed the appendix, and she answered that she had "no independent recollection of what [she] reviewed prior to this opinion," but she "generally" reviewed the appendix in cases before her. In summary, the judge testified that she had no "independent recollection" of Rhinehart's appeal beyond what was stated in the opinion, which was issued years before her deposition, and she

declined to speculate on Rhinehart's proffered "hypotheticals" because she does not decide those issues "without a case in front of [her] that [she] ha[s] to decide or be a part of the decision-making process on."

Similar to the Koeppe matter, Rhinehart "unduly personalized the role of the district court" in the family matter that led to sanctions and the court of appeals ruling affirming them. In his appellate brief, Rhinehart wrote, "The record does not reflect the Cheshire Cat grin on the Court's face as he dismissed this action on his own Motion." He also wrote, "the Court's disdain for [Rhinehart's client] and her counsel was clear." Rhinehart later told the commission that this district court judge "was a lazy judge, and he was disrespectful as hell to me." Further, Rhinehart exclaimed, "The truth is he's too damn lazy to do his job." Despite a lengthy legal career, Rhinehart struggles to gracefully accept cases that do not end in his client's favor.

Incivility has damaging consequences. "In a close case, civility may tip the scales toward a lawyer with a reputation for integrity, causing the uncivil lawyer's client to lose the case." Judith D. Fischer, *Incivility in Lawyers' Writing: Judicial Handling of Rambo Run Amok*, 50 Washburn L.J. 365, 369 (2011) (footnote omitted). It "can result in higher litigation costs for the client via needless arguing about discovery, unnecessary motions to compel, and hearings on those motions that could have been avoided if the parties acted reasonably," and "the depletion and waste of judicial resources" that accompanies this "gratuitous fighting." David A. Grenardo, *A Lesson in Civility*, 32 Geo. J. Legal Ethics 135, 145 (2019) [hereinafter Grenardo]. Moreover, "incivility amongst attorneys increases the stress lawyers must deal with" in an already notoriously stressful profession and "helps perpetuate negative perceptions and stereotypes about lawyers and the legal system—namely that lawyers are arrogant,

rude, obstreperous, and obnoxious jerks, and the client with the most abhorrent lawyer in the case will prevail." *Id.* at 145–46. Finally, "attorneys who act in an uncivil manner can harm their reputation" and "ostracize [the attorney] from the legal community." *Id.* at 146. Rhinehart acknowledged in his past attorney disciplinary case that he had faced professional consequences for his conduct that included a loss of clients. *Rhinehart*, 827 N.W.2d at 181.

Overall, "[c]ivility, which generally means treating others with courtesy, dignity, and respect, comprises an essential trait of a successful lawyer." Grenardo, 32 Geo. J. Legal Ethics at 138. At least 140 state or local bar associations have adopted civility codes to guide attorneys' interactions with opposing counsel, clients, judges, and third parties. Campbell, 47 Gonz. L. Rev. at 141–42. Iowa's rules of professional conduct have not adopted a mandatory civility code, but that does not mean we are left without recourse for attorneys who engage in uncivil behavior. Our district courts can enforce civility through sanction, albeit carefully so "that they are not chilling a lawyer's valid advocacy." *Id.* at 145. "[C]ourts should put in writing any specific obligations relating to civility to ensure that everyone involved in the process is aware of such civility requirements." *Id.* The following ten core concepts of civility serve as a good starting point for courts:

> (1) Recognize the importance of keeping commitments and of seeking agreement and accommodation with regard to scheduling and extensions; (2) be respectful and act in a courteous, cordial, and civil manner; (3) be prompt, punctual, and prepared; (4) maintain honesty and personal integrity; (5) communicate with opposing counsel; (6) avoid actions taken merely to delay or harass; (7) ensure proper conduct before the court; (8) act with dignity and cooperation in pre-trial proceedings; (9) act as a role model to client and public and as a mentor to young lawyers; and (10) utilize the court system in an efficient and fair manner.

*Id.* at 146; *see also* Iowa State Bar Ass'n, *Attorney Regulation*, https://www.iowabar.org/general/custom.asp?page=ProfessionalConduct#:~:text=We%20will%20treat%20all%20other,other%20counsel%2C%20 parties%20or%20witnesses (last visited Dec. 21, 2020) (voluntary standards for professional conduct; now codified in Iowa Court Rules chapter 33); American College of Trial Lawyers, *Code of Pretrial Conduct and Trial Conduct* (2009), https://www.actl.com/docs/default-source/default-document-library/position-statements-and-white-papers/codes_of_pretrial_and_trial_conduct_09_web_permission [https://perma.cc/KCC2-J8PT].

It costs nothing for an attorney to be civil, but, as this case shows, the costs of incivility are high. Let this case serve as a reminder to all attorneys that their "conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms." Iowa Ct. R. 33.1(1). Rhinehart likely could have avoided these disciplinary proceedings altogether simply by treating opposing counsel and judges with the sort of basic decency and respect most learn before first grade.

Waterman, J., joins this special concurrence.